[No. 42473.    En Banc.    December 7, 1972.]

THE STATE OF WASHINGTON, *Respondent*, v. LARRY PERRIGOUE, *Appellant*.

*Mark T. Patterson,* for appellant (appointed counsel for appeal).

*Robert E. Schillberg, Prosecuting Attorney,* and *Arnold M. Young, Deputy,* for respondent.

ROSELLINI, J.—The appellant was charged by information with the crime of grand larceny by color and aid of a check. His demurrer to the information was overruled. When he elected to stand on the demurrer, judgment was entered against him and he was given a maximum sentence of 15 years. The sentence was deferred on condition the defendant remain on probation for a period of 2 years.

Error is assigned to the overruling of the demurrer, by which the appellant raised a question concerning the constitutionality of RCW 9.54.090. It is the appellant's contention that this statute violates the equal protection clause of the fourteenth amendment to the United States Constitution, and article 1, section 12 of the Washington State Constitution, the special privileges and immunities clause. These provisions have been held to be substantially identical in their mandate to the state, prohibiting invidious discrimination in the enactment and enforcement of laws. *Olsen v. Delmore,* 48 Wn.2d 545, 295 P.2d 324 (1956).

RCW 9.54.010 provides, *inter alia:*

Every person who, with intent to deprive or defraud the owner thereof

. . .

(2) Shall obtain from the owner or another the possession of or title to any property, real or personal, by color or aid of any order for the payment or delivery of property or money or any check or draft, knowing that the maker or drawer of such order, check or draft was not authorized or entitled to make or draw the same, or by color or aid of any fraudulent or false representation,

personation or pretense or by any false token or writing or by any trick, device, bunco game or fortune-telling
. . .
. . .
Steals such property and shall be guilty of larceny.

RCW 9.54.090 provides:

Every person who steals or unlawfully obtains, appropriates, brings into this state, buys, sells, receives, conceals, or withholds in any manner specified in RCW 9.54.010—
. . .
(5) Property of the value of more than twenty-five dollars if obtained by color or aid of any order for the payment or delivery of property or money or any check or draft, knowing that the maker or drawer of such order, check, or draft was not authorized or entitled to make or draw the same; or

(6) Property of the value of more than seventy-five dollars, in any manner whatever; shall be guilty of grand larceny and be punished by imprisonment in the state penitentiary for not more than fifteen years.

The appellant does not question the authority of the legislature to make a distinction between larceny by check and the other acts which constitute larceny, as defined in RCW 9.54.010. He does, however, maintain that there is no difference between a transaction involving a check and a transaction involving the use of a credit card, and that since the obtaining of property by fraudulent use of a credit card is made only a misdemeanor, under RCW 9.26A.050,[1] if the value of the property obtained is less than

---

[1]RCW 9.26A.050   "Every person, who with intent to defraud:

"(1) Uses, for the purpose of obtaining money, goods, services or anything else of value, a credit card or identification card obtained or retained in violation of RCW 9.26A.030, or a credit card or identification card which he knows or has reason to believe is forged, expired, incomplete, revoked, or altered by anyone other than the issuer is guilty of a gross misdemeanor, and it shall be presumed that such use was with the intent to defraud and with knowledge that said credit card has been revoked, upon proof that: (a) notice that a credit card has been revoked has been mailed by registered or certified mail, return receipt requested, to the cardholder's last known address or delivered to cardholder or some other person residing with him; (b)

$75, the legislature has treated members of the same class differently and thus violated the constitutional provisions prohibiting invidious discrimination.

█ It is the established rule of law in this state that an enactment is presumptively valid, and the burden is upon the challenger to prove that the questioned classification does not rest upon a reasonable basis. *Boeing Co. v. State,* 74 Wn.2d 82, 442 P.2d 970 (1968).

█ For the principles which must guide the court in determining whether an act has been shown to deny equal protection of the laws, the appellant cites *Rinaldi v. Yeager,* 384 U.S. 305, 308-09, 16 L. Ed. 2d 577, 86 S. Ct. 1497 (1966), quoting the following:

> The Equal Protection Clause requires more of a state law than nondiscriminatory application within the class it establishes. *McLaughlin* v. *Florida,* 379 U.S. 184, 189-190. It also imposes a requirement of some rationality in the nature of the class singled out. To be sure, the constitutional demand is not a demand that a statute necessarily apply equally to all persons. "The Constitution does not require things which are different in fact . . . to be treated in law as though they were the same." *Tigner* v. *Texas,* 310 U.S. 141, 147. Hence, legislation may impose special burdens upon defined classes in order to achieve permissible ends. But the Equal Protection Clause does require that, in defining a class subject to legislation, the distinctions that are drawn have "some relevance to the purpose for which the classification is made." *Baxstrom* v. *Herold,* 383 U.S. 107, 111; *Carring-*

the notice was received by the cardholder or someone else residing with him, proof of which may be accomplished by proof that a signed receipt was returned; and (c) said card was used by the cardholder or by any other person acting with his knowledge or authority, after the date the notice was received or the receipt signed; or

"(2) Obtains money, goods, services or anything else of value, by representing, without the consent of the cardholder or issuer, that he is the holder of a credit card or identification card or by representing that he is the holder of a credit card or identification card and such credit card or identification card has not in fact been issued is guilty of a gross misdemeanor.

"If the value of all the items so obtained under subsections (1) or (2) of this section exceeds seventy-five dollars, then the person is guilty of a felony."

*ton* v. *Rash,* 380 U.S. 89, 93; *Louisville Gas Co.* v. *Coleman,* 277 U.S. 32, 37; *Royster Guano Co.* v. *Virginia,* 253 U. S. 412, 415.

This court has recognized these principles and applied them. *State ex rel. O'Brien* v. *Towne,* 64 Wn.2d 581, 392 P.2d 818 (1964); *State* v. *Persinger,* 62 Wn.2d 362, 382 P.2d 497 (1963); *Clark* v. *Dwyer,* 56 Wn.2d 425, 353 P.2d 941 (1960).

The questions then are, Is there a substantial difference between a check and credit card? and Does that difference bear a reasonable relation to the legislative purpose in imposing a more severe punishment upon the one class of offenders than upon the other, where the value of the property obtained exceeds $25 but is less than $75?

■■ It is the theory of the appellant that, inasmuch as a person who uses a check to purchase a $50 radio receives no more for his fraud than a person who uses a credit card in making the purchase, there exists no valid distinction between the two transactions which would justify the imposition of a more severe punishment in one case than in the other. He cites no authority for this proposition, and we know of no case which has held that the legislature, in defining crimes involving the taking or receiving of property, can distinguish between such offenses only on the basis of the amount taken or received. The value of the stolen property is not the only factor which affects the social evil connected with a given act. The means by which the larceny is accomplished is a circumstance with which the legislature also is legitimately concerned.

That there is in fact a difference between a check and a credit card cannot be doubted. A check is a draft drawn upon a bank and payable on demand, signed by the maker or drawer, containing an unconditional promise to pay a sum certain in money to the order of the payee. RCW 62A.3-104. *See State* v. *Haynes,* 71 Wn.2d 136, 426 P.2d 851 (1967).

A credit card, on the other hand, is a mere token or

indicia that the person named on it has credit with the company which issued it.

"A credit card is nothing more than an indication to sellers of commodities that the person who has received a credit card from the issuer thereof has a satisfactory credit rating and that, if credit is extended, the issuer of the credit card will pay (or see to it that the seller of the commodity receives payment) for the merchandise delivered." *Williams v. United States,* 192 F. Supp. 97, 100 (D.C. Calif.).

*Tillman v. State,* 13 Md. App. 570, 284 A.2d 259 (1971).

A credit sales slip, issued in reliance on a credit card, is not a "security" within the Stolen Property Act provisions (18 U.S.C.A. §§ 2311, 2314) defining the term "securities" and making transportation of forged "securities" in interstate commerce unlawful. *United States v. Jones,* 182 F. Supp. 146, 150 (W.D. Mo. 1960). Having noted that a credit sales slip is nothing more than an "evidence of sale" and does not show on its face a general liability of any person, the federal court in that case said:

No authority is cited by the parties, and independent research has failed to disclose any document held to be a "security" within the ambit of 2311, supra, which has not in some general or specific manner called for the payment, delivery or promise to pay or deliver money or property to the holder thereof, and as to which some innocent person would be tempted to act thereon in its falsely made or forged character.

The distinctions made in that case between a "security" and a credit slip, issued in reliance on a credit card, are not unlike the distinctions between a check and a credit card. The check is an order to pay. It carries with it the representation that funds are on hand in the bank to cover the amount of the check and that it will be paid on presentment. It is negotiable, and can be circulated like money. A credit card, on the other hand, does not purport to be a thing of value. It is not given in payment for goods or merchandise, but is only a written indication that the named owner is entitled to buy on credit. The person who

is induced to part with his property by the fraudulent use of a credit card does so, not because he believes he is being paid but because he believes the person named on the card has a good credit standing with the issuer and that, therefore, his chances of being paid when his bill is presented are good.

A further discussion of the differences between a check and a credit card is not necessary to show that substantial differences do exist. Do these differences bear any reasonable relation to the legislative purpose in treating the person who obtains property through the fraudulent use of a check more severely than one who obtains the same value of property through the fraudulent use of a credit card?

We think the answer must be in the affirmative. The legislature was entitled to note how easily a bank account can be established and blank checks obtained. The frequency and facility with which this particular type of fraud is perpetrated are matters of common knowledge, so that we can take judicial notice of them and assume that the legislature had these circumstances in mind. Not only does the prevalence of check fraud discourage negotiability, it results in great losses to innocent persons.

The legislature also could find that it is not so easy to obtain a credit card as it is to open a bank account; to take into account that the seller relies on the credit of the purchaser rather than upon the card itself for payment, and could find that the incidence of fraud through use of unauthorized credit cards is far less extensive than fraudulent check cashing. It could therefore conclude that fraudulent use of checks is a greater and more prevalent evil than fraudulent use of credit cards and that harsher penalties were needed for offenses involving fraudulent use of checks, in order to discourage resort to this particular crime.

Counsel have brought to the court's attention no case involving an attack upon the constitutionality of a statute treating persons who obtain property through fraudulent use of checks differently from those who obtain property

through the use of other fraudulent devices. The court's research has revealed only one such case, and the result reached there was in harmony with our holding here. That case was *People v. Russell,* 156 Cal. 450, 105 P. 416 (1909), a prosecution for drawing a check on a bank with which the defendant had no funds, with intent to defraud. It was there contended that the act defining the crime violated the constitutional provisions forbidding special legislation because it did not apply to those who drew checks upon persons not named in the statute. The California court found a sufficient reason for the classification in the fact that a check drawn on a bank is "somewhat in the nature of a circulating medium," and held the act constitutional.[2]

We hold that the legislature justifiably found that there is a greater social evil in the fraudulent use of checks than in the fraudulent use of credit cards, warranting the imposition of a more severe penalty for larceny by check. Consequently, RCW 9.54.090 does not violate the equal protection clause of the fourteenth amendment to the United States Constitution or article 1, section 12 of the Washington State Constitution.

HAMILTON, C.J., FINLEY, HUNTER, HALE, STAFFORD, WRIGHT, and UTTER, JJ., concur.

---

[2] *See also Siegel v. Commonwealth,* 176 Ky. 772, 197 S.W. 467 (1917), holding that the legislature could properly draw a distinction between the crime of forgery and the crime of passing a worthless check. *And see "Worthless Check" Acts,* Annots., 23 A.L.R. 459, 76 A.L.R. 1229.